# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW MEXICO

LEONEL ANCHONDO,
CRYSTAL GUTIERREZ, and
YARELI ANCHONDO,

      Plaintiffs,

v.                                  No. 14-CV-0624 MCA/SMV

BASIC ENERGY SERVICES, INC.,

      Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** is before the Court on Defendant Basic Energy Services, Inc.'s Motion to Dismiss for Failure to State a Claim [Doc. 5].   Having considered the parties' submissions, the relevant law, and otherwise being fully advised in the premises, the Court grants the motion.

## BACKGROUND

This matter arises out of an accident that occurred on September 16, 2011, while Plaintiff Leonel Anchondo ("Anchondo"), an employee who had worked for Defendant Basic Energy Services, Inc. ("Basic Energy") for eight months, was servicing an oil well owned by Apache Corporation at a well site known as "Viceroy Number 1."   [Doc. 1-2 ¶¶ 19, 22].

Plaintiffs Anchondo, Crystal Gutierrez, and Yareli Anchondo ("Plaintiffs") allege the following facts in their Complaint for Personal Injury and Employer Liability ("Complaint").

On September 15, 2011, the day prior to the accident, Anchondo, who was the derrickman on the rig sent to service the Viceroy Number 1 oil well, was working with power tongs and rods under 500 pounds of pressure.   [*Id.* ¶¶ 21, 23].   As the derrickman, he was required to ascend to the top of a 96 foot derrick, while strapped into a one-man basket, and to pull rods from the oil

well, align the rods while floor hands used power tongs to unscrew the rods, and then reinsert the rods back into the well.   [*Id.*].

On September 15, 2011, Anchondo climbed the derrick and began pulling rods.   [*Id.* ¶ 24]. He pulled approximately eight to ten rods to assess cleanliness and paraffin build-up.   [*Id.*]. Although the rods had previously been pulled through a stripper designed to remove paraffin, there remained one-half inch of paraffin build-up on them.   [*Id.*].   Paraffin is a substance that accumulates on rods and causes an "unsafe" and "danger[ous]" condition with "severe consequences" for a derrickman pulling rods.   [*Id.* ¶¶ 16, 17, 27, 29, 37].   Black paraffin poses an industry-wide "safety concern."   [*Id.* ¶ 15].

After observing the paraffin on the rods, Anchondo "yelled down to Israel Esparza," who was the relief operator of the rig, "that the well needed hot oil." Hot oil is a treatment known to help resolve paraffin build-up on rods.   [*Id.* ¶¶ 24, 25].   Anchondo "requested" the hot oil because he feared the paraffin on the rods would cause a rod to hit or injure him and because the build-up on the rods was causing the rods to vibrate and the derrick to become unstable.   [*Id.* ¶¶ 25, 27].   Risk of injury increases greatly when a well service company refuses to respond to an employee's request for assistance in the face of "known danger."   [*Id.* ¶ 13].

Esparza observed the paraffin coating the rods and noticed that the paraffin was black. [*Id.* ¶ 26].   Black paraffin is "by far" the "stickiest" type of paraffin.   [*Id.* ¶ 26].   Esparza had never seen rods with as much black paraffin build-up.   [*Id.* ¶ 27].   He knew that it was "unsafe" to pull and insert rods with paraffin build-up prior to treating the rods with hot oil and that failing to treat the rods placed employees in "grave danger."   [*Id.* ¶¶ 27, 30].

Esparza contacted Craig Maxwell, a senior pumper, by telephone to request a hot oil treatment for the well on which Anchondo was working.   [*Id.* ¶ 28].   Maxwell, in turn, called a

2

"company man" to request an oil treatment for the well, but the request was denied.[1]   [*Id.*].

Maxwell notified Esparza of the denial, told Esparza that a hot oil truck was in the area, and

recommended that Esparza contact the company man directly to request an oil treatment.   [*Id.*].

Esparza did so, but the company man denied the request a second time and instructed Esparza to

continue work on the well.   [*Id.*].

Esparza ordered Anchondo to continue pulling rods from the Viceroy Number 1 well even

though Esparza knew that there was an unprecedented amount of black paraffin on the rods and

that pulling the rods was "extremely dangerous."   [*Id.* ¶ 29].   Esparza knew that pulling rods

coated with black paraffin increases the vibration of a derrick, which in turn causes the derrick to

become unstable; Esparza also knew that pulling rods coated with paraffin creates the "extreme[]"

and "known" "danger[]" of a rod hitting a derrickman or of a rod spinning under high pressure

towards a derrickman and "sticking" to hands or other body parts.   [*Id.* ¶¶ 29, 14c, 32, 42, 51].

Esparza could have refused the company man's instruction to require Anchondo to continue to pull

the paraffin-coated rods from the well but Esparza failed to do so.   [*Id.* ¶ 30].   Esparza "utterly

disregarded the dangers [created by the paraffin] because Basic [Energy] routinely utterly

disregarded the dangers of paraffin on rods at well sites in order to ensure continued business at

well sites" and "disregarded the safety of [its] employees in the interest of profit by refusing to stop

work when the company man refused hot oil treatments."   [*Id.* ¶ 29].

---

[1]   In its reply brief, Basic Energy argues that Esparza may not qualify as an employer under *Delgado*.   [Doc. 11 at 5].   Basic Energy contends that Anchondo alleges only that Esparza, who was a rig *relief* operator, determined that the crew should continue working and that Esparza contacted no one at Basic Energy to request hot oil but only a "company man" who worked for the well operator Apache Corporation.   [*Id.*].   The Court will not consider the merits of this argument because the Complaint does not indicate for whom the "company man" worked and, in deciding a Rule 12(b)(6) motion, the Court's inquiry is confined to the allegations in the Complaint, and because Basic Energy failed to raise this argument in its opening brief.

The following day, on September 16, 2011, Esparza ordered Anchondo to pull more rods coated with black paraffin from the Viceroy Number 1 well even though Esparza knew the dangers associated with pulling paraffin-coated rods.   [*Id.* ¶¶ 29, 32].   The massive paraffin build-up on the rods caused significant shaking of Anchondo's derrick, and, after approximately one hour into his shift, Anchondo was injured.   [*Id.* ¶ 33].   When power tongs were attached to one of the black-paraffin-coated rods with which Anchondo was working, the rod began spinning rapidly towards Anchondo's head.   [*Id.*].   Anchondo, strapped into the derrick's one-man basket, had no way to avoid the spinning rod except to put his hand out to prevent the rod from hitting his head. [*Id.* ¶ 35].   When Anchondo did so, the sticky black paraffin on the rod instantly adhered to his glove.   [*Id.*].   Anchondo's left thumb was exposed to the velocity of the spinning rod, and this force, in conjunction with the adhesive quality of black paraffin, was sufficiently violent to detach Anchondo's left thumb from his hand.   [*Id.*].

Basic Energy maintained control over the rig on which Anchondo and the crew were working.   [*Id.* ¶ 31].   Basic Energy could have authorized Anchondo and the crew to stop servicing the well until it was treated with hot oil but Basic Energy refused to do so.   [*Id.*].   Basic Energy routinely and intentionally ordered its employees to continue working at well sites after refusing requests from employees for hot oil despite knowing that working with paraffin-coated rods exposed employees to "extreme danger."   [*Id.* ¶ 37].   There were "a number of easily implemented safety precautions which could have effectively eliminated the risk of harm in this situation."   [*Id.* ¶ 49].   Basic Energy's "intentional and willful decisions were profit-motivated and are an example of elevating production over safety."   [*Id.* ¶ 48].

The Complaint alleges in conclusory form that Anchondo's injuries "were the type reasonably expected to occur as a result of the build-up of paraffin," [*id.* ¶ 35], that "one could

4

reasonably expect [Basic Energy's conduct] to result in the injury suffered by Leonel Anchondo," [*id.* ¶ 39], and that "Basic knew and/or expected [its] willful and/or intentional acts or omissions to result in the injuries suffered by Leonel Anchondo and/or utterly disregarded the consequences," [*id.* ¶ 39; *id.* ¶ 40].   The Complaint also alleges in conclusory form that Basic Energy knew that its failure to follow company safety rules and federal regulations and its ordering of employees to pull paraffin-coated rods would cause "severe injury or death."   [*Id.* ¶ 51j, l].

## **STANDARD**

Federal Rule of Civil Procedure 12(b)(6) authorizes a court to dismiss a complaint for "failure to state a claim upon which relief can be granted."   Fed. R. Civ. P. 12(b)(6).   "The nature of a Rule 12(b)(6) motion tests the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true."   *Mobley v. McCormick,* 40 F.3d 337, 340 (10th Cir. 1994).   A complaint's sufficiency is a question of law, and on a 12(b)(6) motion, a court must accept as true all well-pleaded factual allegations, view those allegations in the light most favorable to the plaintiff, and draw all reasonable inferences in the plaintiff's favor.   *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Smith v. U.S.*, 561 F.3d 1090, 1098 (10th Cir. 2009) (citation omitted), *cert. denied*, 558 U.S. 1148 (2010).

A complaint need not set forth detailed factual allegations, yet a "pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action" is insufficient.   *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).   "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."   *Id.*

To survive a motion to dismiss pursuant to Rule 12(b)(6), a plaintiff's complaint must contain sufficient facts which, if assumed to be true, state a claim to relief that is plausible on its

face.  *See Twombly*, 550 U.S. at 570; *Mink v. Knox*, 613 F.3d 995, 1000 (10th Cir. 2010).  "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).  "Thus, the mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complainant must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims."  *Ridge at Red Hawk, LLC v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007) (emphasis omitted).   The Tenth Circuit has explained,

> "[P]lausibility" in this context must refer to the scope of the allegations in a complaint:  if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs "have not nudged their claims across the line from conceivable to plausible."  The allegations must be enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief.

*Robbins v. Okla.*, 519 F.3d 1242, 1247 (10th Cir. 2008) (quoting *Twombly*, 550 U.S. at 570).

## DISCUSSION

Defendant Basic Energy moves for dismissal of Plaintiffs' Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).   Defendant contends that the Complaint does not state a claim for relief because the New Mexico Workers' Compensation Act ("NMWCA"), N.M. Stat. Ann. §§ 52-5-1 to 52-5-22, provides the exclusive remedy for Plaintiffs' claims.   Although the New Mexico Supreme Court has recognized a narrow exception to the exclusive remedy provisions of the NMWCA, Basic Energy argues that that the facts alleged in the Complaint are not sufficiently egregious to satisfy the requirements of that exception.   Thus, Basic Energy claims that the Court should dismiss Plaintiffs' Complaint pursuant to Rule 12(b)(6).   The Court finds Basic Energy's argument compelling and therefore will grant the motion to dismiss.

6

Basic Energy properly recognizes that the NMWCA provides "the exclusive remedy against employers for employees injured on the job,"[2] provided that the employer complies with the NMWCA's preconditions.[3]   The NMWCA not only bars claims by injured workers against their employers but also derivative claims for loss of consortium by dependents of the employee. *See Archer v. Roadrunner Trucking Inc.*, 930 P.2d 1155, 1162 (N.M. 1997) ("the Workers' Compensation Act bars an action for loss of consortium by the spouse of an injured worker"); *accord Trujillo v. N. Rio Arriba Elec. Coop.*, 41 P.3d 333, 343 (N.M. 2002).   Thus, if Anchondo's claims against Basic Energy are barred by the NMWCA, so too are the derivative claims of Crystal Gutierrez and Yareli Anchondo.

When a worker suffers an accidental injury and the NMWCA's necessary preconditions are satisfied, the NMWCA "provides a scheme of compensation that affords profound benefits to both workers and employers.   The injured worker receives compensation quickly, without having to endure the rigors of litigation or prove fault on behalf of the employer." *Delgado v. Phelps Dodge Chino, Inc.*, 34 P.3d 1148, 1152 (N.M. 2001) (citing *Sanchez v. M.M. Sundt Constr. Co.*, 706 P.2d 158, 160-61 (N.M. Ct. App. 1985) ("The Act, in effect, is designed to supplant the uncertainties of tort remedies and the burden of establishing an employer's negligence with a system of expeditious and scheduled payments of lost wages based on accidental injury or death in the course and scope of employment.")).   "The employer, in exchange, is assured that a worker accidentally injured, even by the employer's own negligence, will be limited to compensation

---

[2]   *Vigil v. Digital Equip. Corp.*, 925 P.2d 883, 884 (N.M. Ct. App. 1996) (citation omitted); *see Hamburg v. Sandia Corp.*, 179 P.3d 1209, 1211 (N.M. 2008) (explaining that the NMWCA's exclusivity provisions shield from tort liability employers who comply with the NMWCA) (citation omitted); N.M. Stat. Ann. § 52-1-6(E).

[3]   *See Rivera v. Sagebrush Sales, Inc.*, 884 P.2d 832, 833-34 (N.M. Ct. App.), *cert. denied*, 883 P.2d 1282 (1994); N.M. Stat. Ann. § 52-1-9.

under the Act and may not pursue the unpredictable damages available outside its boundaries." *Id.* (citing N.M. Stat. Ann. § 52-1-9).  The NMWCA represents the "result of a bargain struck between employers and employees.  In return for the loss of a common law tort claim for accidents arising out of the scope of employment, [the NMWCA] ensures that workers are provided some compensation."  *Coates v. Wal-Mart Stores, Inc.*, 976 P.2d 999, 1004 (N.M. 1999) (citation omitted).

In *Delgado v. Phelps Dodge Chino, Inc.*, the Supreme Court of New Mexico set forth the parameters of the exception to the exclusive remedy provisions of the NMWCA.  *See* 34 P.3d at 1156.  The *Delgado* court explained that "[t]he Legislature clearly intended to extend employers' privilege of immunity from tort liability, like the worker's privilege of expedited compensation, only to injuries accidentally sustained."  *Id*. at 1153.  The court noted, however, that while the Legislature explicitly provided in Section 52-1-9(C) that exclusivity applies only when "'the injury or death is proximately caused by an accident arising out of and in the course of his [or her] employment[,]'" "the Act contains no such provision with regard to employer misconduct."  *Id*. The court stated that, to determine "when employer misconduct should deprive the employer of exclusivity, our courts have, until now, uniformly [applied the] 'actual intent' test."  *Id.* (citations omitted).  "Under this test, 'in order to allege matters which will render an employer liable in tort outside the [NMWCA], the plaintiff must allege matters indicating that the employer intended to injure the plaintiff.'"  *Id.* (quoting *Johnson Controls World Servs. Inc. v. Barnes*, 847 P.2d 761, 764 (N.M. Ct. App. 1993)).

The *Delgado* court ultimately overruled the line of authorities applying the actual intent test because the court concluded that the "test favors employers."  *Id.* at 1154.  The *Delgado* court explained that the test "provides immunity from tort liability for all injuries inflicted by the

employer except those rare, practically unprovable instances in which it is the employer's purpose to injure the worker," and allows "an employer who knows his acts will cause certain harm or death to an employee [to] escape personal responsibility for an act by merely claiming that he/she hoped the employee would make it." *Id*. The court opined that,

> [e]ven more disturbingly, the actual intent test encourages an employer, motivated by economic gain, to knowingly subject a worker to injury in the name of profit-making. As long as the employer is motivated by greed, rather than intent to injure the worker, the employer may abuse workers in an unlimited variety of manners while still enjoying immunity from tort liability.

*Id*.

Instead of the actual intent test, the *Delgado* court held that, "[i]n keeping with Section 52-5-1," which expressly provides that the NMWCA should not be construed to favor either the employer or the worker, "the same standard of conduct that our Legislature deemed non-accidental for purposes of depriving a worker of compensation must determine whether an employer's misconduct renders an injury non-accidental for purposes of exclusivity." *Id*. at 1155. "[W]hen an employer intentionally inflicts or willfully causes a worker to suffer an injury that would otherwise be exclusively compensable under the Act, that employer may not enjoy the benefits of exclusivity, and the injured worker may sue in tort." *Id.* at 1155-56.

The Supreme Court of New Mexico in *Delgado* set out the following test:

> Willfulness renders a worker's injury non-accidental, and therefore outside the scope of the NMWCA, when "(1) the worker or employer engages in an intentional act or omission, without just cause or excuse, that is reasonably expected to result in the injury suffered by the worker; (2) the worker or employer expects the intentional act or omission to result in the injury, or has utterly disregarded the consequences; and (3) the intentional act or omission proximately causes the injury." *Id.* at 1156.

**Application of the *Delgado* Exception**

Basic Energy argues that the Court should dismiss the Complaint because New Mexico law

requires Plaintiffs to allege "egregious" conduct comparable to that in *Delgado* and that Plaintiffs' facts do not rise to this level.   In *Delgado*, plaintiff Reynaldo Delgado was working at a Phelps Dodge Chino, Inc. smelting plant, heating rock to temperatures exceeding 2000 degrees Fahrenheit, removing ore from the rock, discarding the remaining slag into a large iron cauldron, and stopping the flow of slag to allow the cauldron to be replaced when it was reaching capacity. *See id.*at 1151.   On June 30, 1998, Phelps Dodge's supervisory employees encouraged Delgado's work crew to increase productivity to compensate for a loss of production and revenues experienced as a result of a ten day shut-down of the plant.   *See id.*   During Delgado's shift, a "sudden[]" and "especially dangerous emergency situation" arose when the cauldron was reaching capacity and the flow of slag could not be stopped.   *See id.*   This emergency was compounded because "the consistency of the slag caused it to flow at a faster rate than ever, thus resulting in the worst runaway condition that many of the workers on the site had ever experienced."   *Id.*   Phelps Dodge's supervisors could have shut down the furnace in order to stop the flow of slag and then safely remove the cauldron, but, in order to avoid further loss of production and revenue, the supervisors ordered Delgado to remove the cauldron while molten slag was running over the brim. *See id.*   Phelps Dodge issued this order to Delgado, even though he had never before operated a kress-haul under runaway conditions, when the work required him to operate the equipment beneath a thirty-ton cauldron, and when molten slag still was pouring over the cauldron's fifteen-foot brim.   *See id.*; *see also May v. DCP Midstream, LP*, 241 P.3d 193, 197 (N.M. Ct. App. 2010).   In doing so, Phelps Dodge knew or should have known that Delgado would die or suffer great bodily harm.   *See Delgado*, 34 P.3d at 1151.

　　　　When Delgado entered the tunnel, he saw that the ladle was overflowing and radioed his supervisor to inform him that he was neither qualified nor able to perform the removal, but the

supervisor insisted the task be completed, and in response to Delgado's renewed protest and request for help, the supervisor again insisted that Delgado proceed and that he do so alone.   *See id.*   Shortly after Delgado entered the tunnel, the lights shorted out, smoke began pouring from the tunnel, and Delgado "emerged from the smoke-filled tunnel, fully engulfed in flames" and collapsed.   *Id.*   Delgado suffered third-degree burns over his entire body and died three weeks later.   *See id.*

In support of its contention that Plaintiffs' facts are not sufficiently egregious to fall within the *Delgado* exception to the NMWCA's exclusivity provisions, Basic Energy cites the New Mexico Court of Appeals' decision in *Morales v. Reynolds*, 97 P.3d 612 (N.M. Ct. App. 2004). The *Morales* court was the first appellate court in New Mexico to consider the scope of *Delgado*. At the outset, the *Morales* court noted that, "[b]eyond [its 3-part] test, the [*Delgado*] Court did not elaborate on the boundaries of what type of conduct qualifies under the exception to exclusivity." *Id.* at 615.   In attempting to define the parameters of *Delgado*, the *Morales* court opined that the "Supreme Court's decision in *Delgado* stems from [the] egregious employer conduct:   a combination of deadly conditions, profit-motivated disregard for easily implemented safety measures, complete lack of worker training or preparation, and outright denial of assistance to a worker in a terrifying situation."   *Id.*   The *Morales* court determined that courts considering "whether an accident meets the requirements of *Delgado* as a matter of law" must bear in mind "the type of unconscionable conduct that *Delgado* sought to deter."   *Id.* at 616. "So as not to eviscerate the essential provisions of the Act," the court held "that plaintiffs must plead or present evidence that the employer met each of the three *Delgado* elements through actions that exemplify *a comparable degree of egregiousness* as the employer in *Delgado* in order to survive a pre-trial dispositive motion."   *Id.* at 617 (emphasis added).

Basic Energy distinguishes the facts here from those in *Delgado* because Anchondo was tasked with performing a routine task that fell within the scope of his job duties and that he regularly had performed, whereas in *Delgado* the employer ordered the employee to respond to a suddenly appearing emergency that fell outside of the parameters of his ordinary duties and that he had no training or experience in addressing.   Thus, Defendant contends that *Delgado*'s waiver of the NMWCA's exclusive remedy provisions is inapplicable.

The facts in the present case lack the level of egregiousness as those in *Delgado*.  A comparison of the facts demonstrates that Plaintiffs' claims do not fall within *Delgado*'s parameters.  In *Delgado*, a supervisor ordered his employee to respond to (1) an emergency situation of uniquely severe proportions, (2) by removing an overflowing 2000 degree cauldron of molten slag, whose slag was flowing faster than expected due to its consistency, (3) which was a task outside of the employee's regular duties, which he had never undertaken before, and for which he had no training or experience to draw from, (4) with no time to prepare because the emergency arose suddenly, (5) using unfamiliar equipment to accomplish the task, (6) over the employee's repeated objection that he was neither qualified nor able to complete the task and over the employee's request for assistance in accomplishing the task, (7) when the employer could have eliminated the emergency by simply shutting down the furnace which would have stopped the flow of molten slag but chose not to do so to maximize profits.  *See Delgado*, 34 P.3d at 1151.  In contrast, in the present case Basic Energy ordered Anchondo (1) to undertake the routine task of a derrickman, (2) by pulling rods coated with paraffin when paraffin on rods posed an undefined "safety concern" and was "unsafe" and a "danger," (3) which was a task he had been hired to perform and which he had been performing for the eight months he was employed by Basic Energy and had performed the prior day at the same well site with the same amount of paraffin present and

12

no hot oil to treat the rods, (4) with the paraffin not appearing suddenly but rather being present since the beginning of the task the prior day, (5) using familiar equipment, and (6) with only a "request" for hot oil and with no indication from Anchondo that he was unqualified or unable to complete or accomplish the task without the hot oil or that he needed assistance to accomplish the task.

Plaintiffs' facts establish that Basic Energy required Anchondo to complete the routine and familiar task that he was hired to perform using routine equipment. That the rods were coated with paraffin or that Basic Energy refused to provide hot oil was not extraordinary, for Plaintiffs allege that it was Basic Energy's routine to order employees to continue to pull rods coated with paraffin after denying the employees hot oil to resolve the paraffin build-up and Plaintiffs do not allege that this routine resulted in any injuries other than Anchondo's. Thus, Anchondo's task was manifestly different from the suddenly arising calamity that the employee in *Delgado* was ordered to resolve.

Moreover, Plaintiffs have not alleged sufficient facts establishing that the harm Anchondo faced was necessarily comparable to that Delgado faced. That Basic Energy required Anchondo to undertake a task which posed a "safety concern" or that was "unsafe" or "dangerous"[4] is not necessarily the equivalent of ordering an employee alone to assume the obvious risk of certain death or extreme injury as occurred in *Delgado*. Plaintiffs allege, for example, that the risks to a derrickman working with paraffin-coated rods include a rod hitting a derrickman or spinning under

---

[4]   While certain of Plaintiffs' allegations suggest a more serious type of danger, such as, for example, allegations that the danger was "grave," or that Basic Energy knew that ordering employees to pull paraffin-coated rods would cause "severe injury or death," these allegations are conclusory and not sufficient on their own to establish egregious conduct comparable to the employer conduct in *Delgado*.

13

high pressure towards a derrickman and "sticking" to hands or other body parts, but do not indicate how likely this risk is to occur.   That Basic Energy routinely required its employees to work with paraffin-coated rods without the benefit of hot oil, and that Plaintiffs do not allege that this routine practice resulted any accidents other than Anchondo's, suggests that the likelihood of risk is not comparable to the certain risk in *Delgado*.   The generalized risk faced by Anchondo stands in stark contrast to the obvious risk of certain severe injury or death posed by the employer's conduct in *Delgado* of ordering an employee to stand underneath and remove a thirty ton, fifteen-foot high, overflowing cauldron of molten slag that just had been heated to 2000 degrees Fahrenheit, using unfamiliar equipment, when the employee had had no training or experience conducting the task and when the employee informed the employer he was not qualified or able to complete the task.[5] For the foregoing reasons, the Court concludes that Plaintiffs have not satisfied their burden of alleging facts that are of comparable egregiousness to those in *Delgado*.

Plaintiffs' arguments to the contrary do not persuade the Court to hold otherwise.   They contend that "the parallels between the situations present in *Delgado* and those here are striking," and that, if the facts here "do not rise to the level of a *Delgado* claim, it is entirely unclear what factor present in *Delgado* is missing."   [Doc. 8 at 5, 6].   Plaintiffs assert that the following seven similarities exist:

(1)     both men were ordered to accomplish a complicated[,] dangerous task . . . ;

(2)     alone . . . ;

(3)     in circumstances making escape virtually impossible if something went wrong . . . ;

---

[5]   Although the facts are similar in that Plaintiffs here allege that, as in *Delgado*, Basic Energy's decision to deny hot oil was motivated by its concern for bottom line profit over safety, this similarity alone is not sufficient to render the circumstances here comparable to those in *Delgado*.

(4)     in the presence of a danger of remarkable and previously unseen proportions . . . ;

(5)     after explicitly informing their employer that they could not safely perform the task . . . ;

(6)     after relief . . . readily available was denied for economic reasons . . . ;

(7)     and which ultimately resulted in precisely the type of injuries which would be reasonably expected.

[Doc. 8 at 5].   The Court is not persuaded.

The first four purported "parallels" suffer from one pivotal distinction.   Anchondo's task was the very job for which he was hired and regularly had been performing for eight months whereas Delgado's fell outside of his job description, was beyond his qualifications and ability, and was never before performed.   With respect to purported similarity number one, the work performed by Anchondo was the work he was hired to do.   Regarding purported similarities two and three, it is not of consequence that Basic Energy required Anchondo to complete his task alone and in a circumstance where escape virtually was impossible, for Plaintiffs allege that these conditions were integral to his job of derrickman (*i.e.*, Plaintiffs allege that the derrick basket holds only one person and the task of servicing a well requires a derrickman to strap himself into the one-man basket and ascend 96 feet in the air where escape is not immediately possible).   Regarding purported similarity number four, it is not extraordinary that paraffin was present or that hot oil was denied, for Plaintiffs allege that Basic Energy routinely denied hot oil when paraffin was present, and, although the quantity of the paraffin may have been unprecedented, this only complicated what already was a routine part of Anchondo's job.   Moreover, regarding purported similarity five, unlike Delgado, contrary to Plaintiffs' suggestion, Anchondo did not explicitly inform Basic Energy that he could not perform the task safely but rather only "requested" hot oil.

And while similarity six, in contrast, holds true for both Anchondo and Delgado, regarding alleged similarity seven, the Court previously explained why the facts here are not comparable to those in *Delgado*. see *supra* at 13-15,.   For these reasons, the Court is not persuaded that Plaintiffs have identified meaningful parallels between the facts here and those in *Delgado*.

**Application of New Mexico Cases Distinguishing *Delgado***

The New Mexico Court of Appeals' holdings in *Morales v. Reynolds*, 97 P.3d 612, *May v. DCP Midstream LP*, 241 P.3d 193 (N.M. Ct. App. 2010), *Gutierrez v. J.W. Drilling, I.C.*., No. 32,352, 2013 WL 597785 (N.M. Ct. App. Jan. 3, 2013), and *Dominguez v. Perovich Props., Inc*., 111 P.3d 721 (N.M. Ct. App. 2005), *cert. denied*, 113 P.3d 345 (N.M. 2005), lend support to the Court's conclusion that Plaintiffs' facts are not sufficiently egregious to implicate *Delgado,* or to place Basic Energy on notice that its actions were likely to result in serious injury or death.   In each of these cases, the Court of Appeals held that ordering an employee to undertake a task that is otherwise routine and familiar, even if the employer has failed to undertake safety measures or even if there is an added complication of unsafe or malfunctioning machinery, does not rise to the level of egregiousness present in *Delgado*.

In *Morales v. Reynolds*, discussed previously, the Court of Appeals specifically held that ordering an employee to undertake the routine and familiar task of fixing a pump with familiar safety equipment, even if knowing that better safety equipment was available, did not rise to the level of egregious employer conduct in *Delgado*.   *See* 97 P.3d at 614, 618.   In *Morales*, the plaintiff alleged that while he was fixing the pump that carried a dangerous chemical from a storage tank to a mix head, some of the chemical was released, causing the hood of his protective gear to pop up and leave him unprotected from the chemical.   *See id.* at 614.   Morales sought damages for personal injury he sustained (*i.e.*, shortness of breath, wheezing, and chest pains),

16

alleging that his employer intentionally ordered him to fix the pump even though it knew that he would suffer grave injuries as a result of completing the task.  *See id.*  The employer presented evidence that Morales was an experienced worker who performed the task at hand approximately six to twelve times previously with the same safety equipment and there was no evidence that the company was short-cutting safety procedures for economic gain, while Morales presented evidence that the hood on his safety gear had popped off on other occasions, that he had suggested to management that repairs be done using different equipment, and that management knew that the alternative equipment was safer than the type Morales used.  *See id.* at 618.

The court held that "*Delgado* contemplated employers 'willfully injuring [their] workers,'" and that Morales had presented no evidence that his employer "knew or should have known that [its] actions were the equivalent of sending Morales into certain severe injury or death."  *Id.*

The reasoning of *Morales* applies equally here.  The *Morales* court explained that the employee could not demonstrate "that it was reasonable [for the employer] to anticipate that sending [the employee] to work on this pump would cause his injury," when, "[t]o the contrary, [the employee] had worked on a pump with the same equipment numerous times before, and his safety hood had even popped off in the past without causing any injury."  97 P.3d at 618.  So too, here, sending Anchondo to complete the duties for which he was hired, using familiar equipment, when Anchondo had completed this task over the course of his eight-month tenure as a Basic Energy employee, is incompatible with a finding that Basic Energy knew or should have known that sending him to complete this task would cause him injury.  Moreover, just as the *Morales* court noted that Morales had safely worked on a pump with his hood popping off without causing injury, *see id.*, here too Anchondo had worked on the Viceroy Number 1 well the previous day with the same amounts of paraffin and no hot oil, and with no accompanying injury.

17

Likewise, the New Mexico Court of Appeals' decision in *May v. DCP Midstream L.P.*, supports the Court's conclusion that Basic Energy was not on notice that its conduct was the equivalent of sending Anchondo to face certain injury or death.  In *May*, the court held that instructing an employee to perform a routine and familiar task, even if on equipment that had been modified and made more dangerous, did not rise to the level of egregiousness present in *Delgado*. *See* 241 P.3d at 197.   The *May* plaintiff was tasked to remove a standard "pig", which is a gas pipe inspection gauge sent through the pipeline to clean deposits and buildup, using a pig receiver that had been modified to accept a non-standard "smart" pig and not returned to the configuration designed safely to receive standard pigs.  *See id.* at 195.   The plaintiff, "[d]ue to the modified configuration of the receiver, . . . was unable to determine that the pig was lodged in the twelve-foot pup, unable to determine that there was 250 pounds of pressure behind the pig, and unable to relieve any pressure from the pup."  *Id.*   Moreover, to attempt to locate the pig, the plaintiff had to place himself in front of the receiver opening.   *Id.*   While performing his task, the pig suddenly became dislodged and struck the plaintiff, at approximately ninety miles per hour, in the forearm, head, and jaw, resulting in significant injuries.  *See id.*   The plaintiff alleged his employer knew that the receiver was "'dangerously ill-suited for using and extracting the normal pig from the pipeline,'" and that the failure to return the receiver to its normal configuration or train Plaintiff to retrieve pigs with a modified receiver, "constitute[d] an intentional act or omission . . . reasonably expected to result in the injury he suffered."   *Id.* at 196.   An internal investigation report confirmed the heightened risks that personnel using the receiver to retrieve standard pigs faced as a result of the modification.   *See id.*   An internal document also recommended that the company mitigate the risk by taking certain precautions, which the company did not take.   *See id.* at 197.

*May* held that the employer's conduct was not comparably egregious to that of the employer in *Delgado* because the "Plaintiff was performing a routine pig removal, albeit on unsafe equipment that had been modified to receive smart pigs, that he had performed at least ten times before" successfully.  *Id.*  The court distinguished *Delgado* because the employer there knew that it was sending an employee into almost certain injury or death, and utterly disregarded the consequences in favor of the profit bottom line, whereas the "Defendants in this case allowed a negligently dangerous condition to persist, but there is no indication that, in leaving the receiver in its reconfigured state, they knew or expected Plaintiff's injuries to occur."  *Id.* at 197-98.   Just as the court in *May* concluded that a routine and familiar task is not the equivalent of sending an employee into almost certain injury or death, so too does this Court hold that Basic Energy's conduct of allowing the dangerous condition of paraffin coating the rods to persist does not rise to the level of egregious conduct in *Delgado*.

The New Mexico Court of Appeals' decision in *Gutierrez v. J.W. Drilling, I.C.* provides further support for the Court's conclusion that Basic Energy's conduct is not the equivalent of the employer's conduct in *Delgado*.  In *Gutierrez*, the court held that requiring an employee to perform a routine task that he was trained to do, even if using malfunctioning equipment and even if the employer had been warned that use of the equipment would result in injury or death, was not sufficiently egregious to invoke the *Delgado* exception.  *See* 2013 WL 597785, at *1.  The plaintiff in *Gutierrez* alleged that one of the company's supervisors informed the company of a problem with the machinery—*i.e.*, a malfunctioning cathead—on which the plaintiff was working and notified the company that injury or death would occur if the company continued operating the defective equipment.  *See id.*  The task being performed by the plaintiff when he was injured was a routine task that he was trained to do, and, although the plaintiff asserted that he was

19

uncomfortable with the malfunctioning cathead, the plaintiff did not allege that he requested to stop work.  *See id*.  The *Guitierrez* court concluded that the situation faced by the plaintiff "'[wa]s simply not analogous to the . . . sudden calamity that the worker in *Delgado* faced.'"  *Id*. (quoting *May*, 241 P.3d at 198).   Just as the routine task in *Gutierrez* was not the equivalent of sending a plaintiff to almost certain death or serious injury, so too here, the routine task of pulling rods coated with paraffin did not rise to the level of egregious conduct in *Delgado*.

Finally, in *Dominguez v. Perovich Properties., Inc*., the New Mexico Court of Appeals held that requiring the plaintiff to perform the routine and familiar task of cleaning a screener did not rise to the level of egregiousness necessary to invoke the *Delgado* exception.   *See* 111 P.3d at 727.   In *Dominguez*, a supervisor instructed the plaintiff to perform a routine maintenance task on the screener, and, while the plaintiff was standing on the conveyor belt, the supervisor without warning started the equipment, causing the plaintiff to be injured.   *See id.* at 722.   The plaintiff presented evidence that employer had no mandatory manual lock-out devices for the equipment although such devices were available to prevent the conveyor belt from moving while a person was on it and that the employer was in violation of multiple state and federal rules and regulations. *See id.* at 723.   The *Dominguez* court held that requiring the plaintiff to perform a routine task, with which he was familiar and had performed in the past, "was hardly the equivalent of sending Plaintiff into certain injury."   *Id.* at 727.   The reasoning of *Dominguez* applies equally here.

In addition to standing for the proposition that routine conduct does not rise to the level of the egregious conduct in *Delgado*, the foregoing authorities also refute Anchondo's argument that the "unprecedented" amounts of paraffin present on September 15 and 16, 2011, transformed an ordinarily routine task into an extraordinary task akin to the sudden and severe emergency in *Delgado*.   The nature of the routine and familiar task assigned was not changed simply because

more paraffin was present than usual on those days.   In *May*, the court similarly refused to hold that an otherwise routine task of removing a standard pig was transformed into an extraordinary task akin to that in *Delgado* simply because the employee was required to utilize equipment that was more dangerous.   *See* 241 P.3d at 197.   Likewise, in *Gutierrez*, the court confirmed that the plaintiff's otherwise routine task of using machinery on which the employee was trained to work was not transformed into a dangerous task simply because the machinery was malfunctioning, even though the evidence established that the malfunction would result in injury or death.   *See* 2013 WL 597785, at *1.

The foregoing authorities also refute Anchondo's argument that Basic Energy's failure to use necessary safety equipment and failure to follow industry standards were sufficient to establish intentional conduct falling within the *Delgado* exception.   Admittedly, Basic Energy increased the risk to Anchondo by requiring him to perform the routine work he was hired to do as a derrickman without the benefit of hot oil.   But the *May* and *Dominguez* courts confirmed that the failure to provide a safer alternative demonstrates neither intent nor inherent probable injury.[6] The *Morales* court held that a failure to provide safety measures is not sufficient to establish that a reasonable person would have expected the failure to provide these measures to result in injury. *See Morales*, 97 P.3d at 618 (holding that the availability of better safety equipment does not establish that a reasonable person would have anticipated that the completion of a routine job using routine equipment would lead to injury).   Moreover, the *Dominguez* court held that the failure to

---

[6]   *See, e.g.*, *Dominguez*, 111 P.3d at 727 (requiring an employee to perform a routine task was not the equivalent of sending an employee to face certain injury or death because the failure to take safety measures by itself demonstrates neither intent nor inherent probable injury); *May*, 241 P.3d at 197 (concluding that requiring "an employee [to] perform a routine . . . task which he had performed before is not the same as sending an employee to face certain injury," and that "the absence of safety measures by itself demonstrates neither intent nor an inherent probability of injury").

follow industry safety and other requirements does not give rise to a *Delgado* claim.   *See Dominguez*, 111 P.3d at 727 (acknowledging that "[i]t is appalling that some employers disregard safety requirements," but holding that doing so "do[es] not permit a conclusion that the employer has specifically and willfully caused the employee to enter harm's way, facing virtually certain serious injury or death, as contemplated under *Delgado*").

Consistent with the reasoning in *Morales*, *May*, *Gutierrez*, and *Dominguez*, the Court concludes that the routine and familiar nature of Anchondo's task of pulling and running rods, even if coated with "unprecedented" amounts of paraffin and even if undertaken without the benefit of the safety measure of hot oil, is at odds with a finding that Basic Energy knew or should have known that it was sending Anchondo to almost certain injury or death.   Thus, on the facts alleged, the Court concludes that *Delgado's* exception to the NMWCA's exclusive remedy provisions does not apply.

<u>CONCLUSION</u>

Plaintiffs have failed to allege facts of comparable egregiousness to those in *Delgado*. Thus, the Court concludes that Plaintiffs cannot state a *Delgado* claim and that *Delgado*'s exception to the NMWCA's exclusive remedy provisions is inapplicable.   Because Section 52-1-6(E) provides that the NMWCA constitutes the exclusive remedy against employers for employees injured on the job, *see* N.M. Stat. Ann. § 52-1-6(E), and because the NMWCA's exclusive remedy provisions bar not only claims by injured workers against their employers but also derivative claims for loss of consortium by dependents of the employee, *see Archer v. Roadrunner Trucking Inc.*, 930 P.2d 1155, 1162 (N.M. 1997); *Trujillo v. N. Rio Arriba Elec. Coop.*, 41 P.3d 333, 343 (N.M. 2002), the Court concludes that the NMWCA precludes both Anchondo's claims as well as the derivative claims of Crystal Gutierrez and Yareli Anchondo.

Plaintiffs do not state a claim for relief, and the Court therefore grants Basic Energy's motion to dismiss.[7]

       **IT THEREFORE IS ORDERED** that Defendant Basic Energy Services, Inc.'s Motion to Dismiss for Failure to State a Claim [Doc. 5] is hereby **GRANTED**.


**SO ORDERED** this 18th day of March, 2015.


                                      _____

                                    M. CHRISTINA ARMIJO

                                    CHIEF UNITED STATES DISTRICT JUDGE

---

[7]  The Court declines to consider the remaining arguments advanced by Basic Energy in support of its motion to dismiss, including its argument that dismissal of Plaintiffs' derivative claims is appropriate because Plaintiffs have failed to allege—even in conclusory form—the elements necessary to establish these claims. The Court already has dismissed all of Plaintiffs' claims because they are barred by the exclusivity provisions of the NMWCA and Plaintiffs have failed to establish that the *Delgado* exception to the Act's exclusivity applies. This holding is dispositive and ends the Court's inquiry.